## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **z4 TECHNOLOGIES, INC.** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:06-CV-142** |
| | § | |
| **MICROSOFT CORPORATION,** | § | |
| **AND AUTODESK, INC.** | § | |
| | § | |
| **Defendants** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Autodesk Inc.'s ("Autodesk") Motion for Judgment as a Matter of Law of Noninfringement (Docket No. 330); Defendant Microsoft Corporation's ("Micrososft") Motion for Judgment as a Matter of Law of Noninfringement (Docket No. 332); Defendants Microsoft and Autodesk's (collectively "Defendants") Motion for Judgment as a Matter of Law of Invalidity (Docket No. 319); Microsoft's Motion for Judgment as a Matter of Law Regarding Damages, Non-Retail Products, and Willfulness (Docket No. 323); Autodesk's Motion for Judgment as a Matter of Law Regarding Damages (Docket No. 321); Microsoft and Autodesk's Motion for a New Trial (Docket No. 327); Autodesk and Microsoft's Statements of Fact and Conclusions of Law Regarding Inequitable Conduct (Docket No. 322); Plaintiff z4 Technologies Inc.'s ("z4") Proposed Findings of Fact and Conclusions of Law Regarding Inequitable Conduct (Docket No. 334); z4's Motion and Brief in Support for an Order Finding Litigation Misconduct, Enhancing Damages, and Awarding Attorney Fees and Expenses (Docket No. 329); z4'sMotion and Brief in Support for Prejudgment Interest (Docket No. 318); z4's Emergency Motion to Strike

Docket Entry 344 (Docket No. 354); Autodesk and Microsoft's Emergency Opposed Motion for the

Court to Consider the Expert Report of Walter Bratic Relating to Docket Nos. 321 and 323 (Docket

No. 369); and z4's Motion and Memorandum in Support to Unseal Findings Related to z4's Motion

for Permanent Injunction for Docket Entries 346, 347, 353, 370, and 371 (Docket No. 376).

The Court **DENIES** all motions for judgment as a matter of law, Defendants' motion for a

new trial, and **HOLDS** that both patents-in-suit are enforceable, therefore, upholding all portions

of the jury's verdict.  The Court **GRANTS** z4's motions awarding z4 enhanced damages, attorneys'

fees and expenses, and prejudgment interest.

### BACKGROUND

On September 22, 2004, z4 brought this suit against Microsoft and Autodesk alleging

infringement of U.S. Patent Nos. 6,044,471 ("the '471 patent") and 6,785,825 ("the '825 patent").

The '471 patent issued March 28, 2000.  The '825 patent issued August 31, 2004.  David Colvin

("Colvin") is the inventor of both patents and the founder and president of z4.  The patents disclose

methods, referred to as product activation, for limiting the unauthorized use of computer software.

The case was tried to a jury on April 10 through April 19, 2006.  At trial, z4 asserted claim

32 of the '471 patent and claims 44 and 131 of the '825 patent.  z4 alleged that Microsoft's "Office"

group of application products and "Windows" operating system and Autodesk's complete line of

software infringed all three asserted claims of the two patents.  z4 contended that Microsoft's Office

software contained infringing product activation starting in 2000 and that the Windows product

started including the same technology in 2001.  z4 alleged that all of Autodesk's software released

after March of 2004 included product activation, which infringed claim 32 of the '471 patent and

claim 131 of the '825 patent.  Microsoft and Autodesk both claimed that their software did not

infringe, that the '471 and '825 patents were invalid for anticipation and obviousness, and that both patents were unenforceable due to Colvin's inequitable conduct.

The jury found that Microsoft infringed claim 32 of the '471 patent and claims 44 and 131 of the '825 patent and that Microsoft's infringement was willful.  The jury found that Autodesk infringed the two claims asserted against it.  The jury also found that neither Microsoft nor Autodesk proved by clear and convincing evidence that any of the listed claims of the patents in the lawsuit were invalid.  The jury awarded $115 million in damages against Microsoft and $18 million against Autodesk.

## AUTODESK'S AND MICROSOFT'S MOTIONS FOR JMOL

### JMOL Standard

A court may grant a motion for Judgment as a Matter of Law ("JMOL") with regard to a particular issue when "'there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue.'" *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005)(citing Fed. R. Civ. P. 50(a)); *see Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005).

> Rule 50(a)(1) provides, in relevant part, that if a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law [JMOL] against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed. Cir. 1998).  A court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party, however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150-51 (2000).

**Autodesk's Motion for Judgment as a Matter of Law of Noninfringement**

Autodesk moves for JMOL arguing that z4 did not present sufficient evidence for a reasonable jury to find that Autodesk's accused products infringe claim 32 of the '471 patent and claim 131 of the '825 patent. Autodesk presents multiple arguments to support its motion, however, Autodesk's arguments are unpersuasive.

Autodesk first argues that z4 did not present a prima facie case for infringement because it did not establish that every single limitation in each asserted claim was identically met by Autodesk's products. To the contrary, z4 presented sufficient evidence through its expert William Rosenblatt ("Rosenblatt") such that a reasonable jury could have concluded that every limitation of the patents-in-suit were infringed by Autodesk's accused products. *See* 4/12/06 Trial Tr. 78:5-98:1, 103:2-120:24; Pl.'s Ex. 51.

Autodesk contends that the Court's mid-trial construction of the term "user" was incorrect and that under Defendant's proposed construction, which the Court rejected, z4 did not present sufficient evidence for a jury to find infringement.[1] Autodesk's argument is based on the conclusion that the Court's construction of the term "user" is incorrect. The Court's April 12, 2006 order construing the term "user" stands. Accordingly, Autodesk's argument based on its construction of the term "user" fails.

Autodesk also argues that the Court improperly construed the term "automatically

---

[1] In the context of trial, the parties brought to issue the meaning of the term "user" as it appears in both the '825 and '471 patents. Although the parties had not submitted this term for construction during the pretrial *Markman* proceedings, it became obvious as the trial progressed that there was substantial disagreement over the meaning of the term, which would be confusing to the jury. Accordingly, in fulfilling its *Markman* claim construction responsibilities, on April 12, 2006, during the course of trial and after hearing arguments from both sides, the Court issued an order construing the term "user" as "a person, a person using a computer, a computer, or computers."

contacting" in claim 32 of the '471 patent and that Autodesk does not infringe under its proposed construction, which was also rejected by the Court.  Again, the Court's claim construction of "automatically contacting" stands and Autodesk's argument fails.

Finally, Autodesk contends that z4 did not present sufficient evidence that Autodesk's accused products satisfied the "password" limitations of the '825 patent.  However, z4 presented sufficient evidence that a reasonable jury could conclude that Autodesk's accused products met the "password" limitation of the '825 patent.  *See* 4/12/06 Trial Tr. 92:3-13; Pl.'s Ex. 14.

Drawing all reasonable inferences in favor of z4, there is sufficient evidence that a reasonable jury could find that Autodesk's accused products infringe the patents-in-suit. Accordingly, Autodesk's motion for JMOL of noninfringement is **DENIED**.

### Microsoft's Motion for Judgment as a Matter of Law of Noninfringement

Microsoft moves for JMOL arguing that z4 did not present sufficient evidence for a reasonable jury to find that Microsoft's accused products infringe claim 32 of the '471 patent and claims 44 and 131 of the '825 patent.  In support of its motion for JMOL, Microsoft presents almost the identical arguments as Autodesk.  For the same reasons stated above with regard to Autodesk's motion, Microsoft's arguments are unpersuasive.  Drawing all reasonable inferences in favor of z4 there is legally sufficient evidence in the record that a reasonable jury could find that Microsoft's accused products infringe all three asserted claims of the patents-in-suit.  *See* 4/12/06 Trial Tr. 78:5-98:1, 103:2-120:24; Pl.'s Ex. 102.  Accordingly, Microsoft's motion for JMOL of noninfringement is **DENIED**.

### Microsoft and Autodesk's Motion for JMOL of Invalidity

Defendants argue that claims 32 of the '471 patent and claims 44 and 131 of the '825 patent

5

are invalid because the claims are anticipated by prior art under 35 U.S.C. § 102(b) and (g) and

because each would have been obvious under 35 U.S.C. § 103.[2]  Defendants carry the burden of

proof on issues of invalidity and must prove the patent is invalid by clear and convincing evidence.

*See Nobelpharma*, 141 F.3d at 1065.  A motion for JMOL in favor of the party that bears the burden

of proof at trial should only be granted where "(1) the movant 'has established [its] case by evidence

that the jury would not be at liberty to disbelieve.' and (2) 'the only reasonable conclusion is in [the

movant's] favor.'"  *Id.*

Anticipation

Defendants argue that claim 32 of the '471 patent and claims 44 and 131 of the '825 patent

are anticipated by Microsoft's Brazilian Publisher 1998 ("BP 98") under 35 U.S.C. § 102(g)(2).

Under § 102(g)(2), a patent is invalid for anticipation if

> before such person's invention thereof, the invention was made in this country by
> another inventor who had not abandoned, suppressed, or concealed it.   In
> determining priority of invention under this subsection, there shall be considered not
> only the respective dates of conception and reduction to practice of the invention, but
> also the reasonable diligence of one who was first to conceive and last to reduce to
> practice, from a time prior to conception by the other.

Defendants contend that BP 98 was conceived and architected by June of 1997, before Colvin's

conception date of September 1997 and before Colvin reduced his invention to practice by filing his

---

[2]  Citing *Duro-Last , Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1105 (Fed. Cir. 2003), z4 argues that Defendants did
not articulate the specific grounds of their JMOL as to obviousness at the close of evidence and, therefore, are not
allowed to raise the issue in there post-trial motion for JMOL.  In *Dura-Last*, the Federal Circuit did indicate that
Federal Circuit law, as opposed to Fifth Circuit law, controls the issue raised by z4.  *See* 321 F.3d at 1106.
However, the Federal Circuit's opinion did not indicate that the general liberal standard taken by most circuits
regarding the predicate for a Rule 50(b) JMOL should be abandoned in patent cases.  The Federal Circuit stated that
the liberal standard is appropriate when it is largely technical and no prejudice results from the application of that
standard.  *See id.*  Here, z4 was not prejudiced by Defendants' lack of specificity when it moved for JMOL at the
close of evidence.  z4 does not carry the burden of proof on invalidity and was aware from testimony at trial that
both obviousness and anticipation were at issue in the case.  Accordingly, Defendants are not precluded from urging
a motion for JMOL post-trial with regard to invalidity based on either obviousness or anticipation.

patent application in June of 1998.

In order for BP 98 to anticipate the '471 patent, Defendants must prove by clear and convincing evidence that BP 98 worked for its intended purpose. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006). Considering the JMOL standard discussed above and the evidence presented at trial, a reasonable jury could have concluded that BP 98 did not work for its intended purpose, to stop piracy. *See* Pl.'s Ex. 92, Pl.'s Ex. 558, 4/18/06 Tr. Trans. 75:17-76:8. Therefore, Defendants did not establish that the only reasonable conclusion on the issues of anticipation must be in their favor. Although Defendants have other arguments for why their motion for JMOL should be granted based on BP 98, the fact that a reasonable jury could have concluded that BP 98 did not work for its intended purpose prevents the Court from granting Defendants' motion.

At trial, Defendants also argued that Autodesk's AutoCAD R13 ("R13") software anticipates claim 32 of the '471 patent under 35 U.S.C. § 102(b) because it was offered for sale, sold, and used before June 4, 1997. Under 35 U.S.C. § 102(b), a patent is invalid for anticipation if the "invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." The critical date for the '471 patent is June 4, 1997.

Defendants had to prove that R13 included every limitation of claim 32 of the '471 patent in order to succeed on invalidity based on R13. *See Cooper v. Goldfarb*, 240 F.3d 1378, 1382 (Fed. Cir. 2001). Claim 32 of the '471 patent requires "instructions for automatically contacting the authorized representative." *See* '471 Patent, col 12:1-2. The Court construed this phrase to mean "instruction (i.e. computer code) that enable a user's computer to contact the authorized representative." Defendants argue that registration using email or a web browser constitutes a

7

computer code for contacting the authorized representative.  Although there were other arguments made at trial for why R13 did not anticipate claim 32 of the '471 patent, based on the evidence presented at trial, a jury could reasonably conclude that R13 did not meet the "automatically contacting" limitation of the claim.  Accordingly, Defendants' motion for JMOL cannot succeed on this basis.

Defendants further argue that Autodesk's AutoCAD R14 ("R14") software anticipates claim 32 of the '471 patent under § 102(b) because it was offered for sale and sold prior to June 4, 1997.  As with Defendants' argument related to R13, Defendants had to prove that R14 met the "automatically contacting" limitation of claim 32.  For the same reasons discussed above, a reasonable jury could conclude that R14 did not meet this limitation and Defendants' motion for JMOL cannot succeed based on this argument.

Defendants argue that Autodesk's AutoCAD R13c4a New Zealand ("R13c4a NZ") software anticipated claim 32 of the '471 patent and claims 44 and 131 of the '825 patent under § 102(g)(2) because it was conceived and reduced to practice in February 1997.  As with Defendants' argument related to R13 and R14, Defendants had to prove that R13c4a NZ met the "automatically contacting" limitation of claim 32 to succeed on this issue at trial.  Defendants contend that R13c4a NZ met the "automatically contacting" element of claim 32 of the '471 patent because a user could provide registration information to Autodesk via email.  Again, as with the R13 and R14, a reasonable jury could conclude that R13c4a NZ did not meet this limitation.

Defendants' expert used the term "electronic registration" recited in claims 44 and 131 of the '825 patent interchangeably with the "automatically contacting" term in claim 32 of the '471 patent.  For the same reasons discussed above with regard to claim 32, a reasonable jury could have

concluded that the "electronic registration" limitation of claims 44 and 131 of the '825 patent were not met by R13c4a NZ.  Accordingly, Defendants' motion for JMOL cannot succeed on these grounds.

Defendants continually argue that z4 did not directly dispute certain evidence that Defendants claim proved a particular element of their anticipation defense at trial. But Defendants, not z4, carried the burden of proof on anticipation at trial.  Defendants were required to prove the elements of anticipation by clear and convincing evidence such that a jury could not be at liberty to disbelieve that the patents-in-suit were anticipated by prior art.  *See Nobelpharma*, 141 F.3d at 1065. Based on the evidence presented by Defendants and drawing all reasonable inferences in favor of z4, a reasonable jury could conclude that Defendants did not meet their burden and prove that either claim 32 of the '471 patent or claims 44 and 131 of the '825 patent were anticipated by the products discussed above.

*Obviousness*

Under 35 U.S.C. § 103, a patent cannot be obtained on an invention "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains."  The determination of obviousness is ultimately a question of law that involves factual findings such as "(1) the scope and content of prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) where relevant, objective evidence of nonobviousness, e.g. , long-felt need, commercial success, failure of others, copying, unexpected results, i.e., the secondary considerations."  *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291 (Fed. Cir. 1985).  A patent is presumed valid, under 35

U.S.C. § 282, therefore, Defendants were required to prove by clear and convincing evidence that the '471 and '825 patents were invalid for obviousness.  *See Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006).  "The presumption of validity is a procedural device that mandates that the party asserting invalidity bears the initial burden of establishing a *prima facie* case of obviousness under 35 U.S.C. § 103."  *Ashland Oil*, 776 F.2d at 291.  Once the party alleging invalidity has established a prima facie case of obviousness, the patentee has the burden of presenting rebuttal evidence showing that the claimed invention was not obvious.  *Id*. at 292.

Defendants argue that they offered "unrebutted testimony" that the inventions of claim 32 of the '471 patent and claims 44 and 131 of the '825 patent were obvious based on BP 98, R13, R14, and R13c4a NZ.  The only direct evidence that Defendants offered as to obviousness was the testimony of their expert Dr. Avi Rubin ("Rubin"):

> Q:     Could you please provide your expert opinion on obviousness, whether Mr. Colvin's patents are obvious in light of the prior art?
>
> A:     Yes, I believe that —everything that's disclosed—that's claimed in these two patents is obvious to one of ordinary skill in the art at the time of the invention, given the products that where the prior art at that time and before it.

4/18/06 Trial Tr. 100:6-13.  It is questionable whether Defendants even established a prima facie case of obviousness.  Even assuming that Defendants did establish a prima facie case of obviousness, z4 presented some evidence to rebut Defendants' minimal evidence of obviousness. *See* 4/12/06 Trial Tr. 122:12 - 123:24.

Defendants must prove the patents-in-suit were invalid for obviousness by clear and convincing evidence that a jury could not be at liberty to disbelieve.  *See Nobelpharma*, 141 F.3d at 1065.  Based on the evidence presented by Defendants and drawing all reasonable inferences in favor of z4, a reasonable jury could conclude that Defendants did not meet their burden and prove

10

that either claim 32 of the '471 patent or claims 44 and 131 of the '825 patent were obvious.

*Conclusion*

It was Defendants burden of proof at trial to prove that the patents-in-suit were invalid by clear and convincing evidence.  Defendants did not establish invalidity based on anticipation or obviousness with evidence that a jury would not be at liberty to disbelieve nor did they establish that the only reasonable conclusion on the issues of invalidity must be in their favor.  *See Nobelpharma*, 141 F.3d at 1065.  Accordingly, Defendant's motion for JMOL is **DENIED**.

**Microsoft's Motion for Judgment as a Matter of Law Regarding Damages, Non-Retail Products, and Willfulness**

Microsoft argues that the Court should grant its motion for JMOL based on three grounds.

Damages for products outside of the retail chain

Microsoft argues that the Court should grant its motion for JMOL because no reasonable jury could conclude that Microsoft's non-retail products infringe the patents-in-suit.  Microsoft contends that there is no evidence that any Microsoft products sold outside of the retail channel infringe the patents-in-suit.  Microsoft argues that z4's technical expert Rosenblatt only testified with regard to whether retail products infringe z4's patents-in-suit and did not address whether OEM or volume licensing channel products infringe.[3]

Contrary to Microsoft's contentions, z4 did present some evidence at trial that both Microsoft's OEM and retail channel products use product activation and, therefore, potentially infringe the patents-in-suit.  z4 introduced into evidence Plaintiff's Exhibit 63, which is entitled "Frequently asked questions about Microsoft Product Activation" and was posted on Microsoft's

---

[3]  OEM stands for original equipment manufacturer and refers to computer manufacturers that sell Microsoft programs installed on their machines.

website as of June 9, 2004.  The document stated that "Product activation is required in retail packaged products and in new computers that have been purchased from a computer manufacturer. . . ." and "All customers who purchase retail packaged products or a new computer from an original equipment manufacturer (OEM) have to activate the product.  The products on a new computer that was purchased from an OEM may be activated in the factory."  z4 also introduced into evidence the "Frequently asked questions about Microsoft Product Activation" document found on Microsoft's website as of January 10, 2006, which also included the same statements related to product activation as Plaintiff's Exhibit 63.  *See* Pl.'s Ex. 56.  Furthermore, in an interrogatory response that was read into the record, Microsoft stated:

> For any accused product that actually uses the accused product activation technology, for purposes of the patents-in-suit, the steps of the product activation are the same whether the accused product is licensed or activated in the United States or in another country.  As in the United States, all of the accused products licensed outside the United States through the volume licensing channel do in [sic] not use product activation and most of the accused product licence [sic] through the OEM channel likewise do not use product activation.  Outside of the United States is primarily accused products sold through the retail channel that use product activation.

4/18/06 Trial Tr. 104:15-105:2.  Even if Rosenblatt only established that Microsoft's retail products infringed the patents-in-suit, based on the evidence submitted to the jury, a reasonable jury could conclude that the OEM and retail products worked in the same way with regard to product activation.  Furthermore, based on the evidence, a reasonable jury could have concluded that at least some of the OEM channel products used product activation and infringed the patents-in-suit.[4]

Willfulness

---

[4]  The jury may have taken this into consideration in awarding $115 million in damages against Microsoft instead of the $369 million that z4 asked the jury to award based on its damage calculations, which included both retail and OEM products sales.

Microsoft contends that z4 did not present sufficient evidence at trial to support the jury's finding of willful infringement against Microsoft.  Willful infringement must be determined based on the totality of the circumstances.  *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342-43 (Fed. Cir. 2004).  Willfulness must be proven by clear and convincing evidence.  *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990).  Willfulness is a question of the infringer's intent as determined by the circumstances.  *Id*.  Once a party has actual notice of another's patent rights, that party has an affirmative duty of care to determine whether or not he infringes.  *See Imonex Servs., Inc. v. W. H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1377 (Fed. Cir. 2005).  There is no hard and fast *per se* rule when it comes to determining willfulness.  *Rolls-Royce, Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986).  However, facts that are often considered in determining willfulness are whether the infringer deliberately copied the patentee's invention, whether the infringer investigated the scope of the patent and determined a good faith basis as to whether he was infringing or that the patents were invalid, and the infringer's behavior as a party to the litigation.  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1986).  A patentee must present threshold evidence that an infringer's actions were willful.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004).

Microsoft argues that z4 did not present clear and convincing evidence of willfulness and argues that it presented evidence that it exercised sufficient due care to overcome a finding of willful infringement.  Microsoft argues, among other things, that the only evidence of willfulness was the deposition testimony of Susan Cole ("Cole"), Microsoft's corporate representative.  The portion of Cole's deposition that was read into the record at trial states:

"Can you tell us the factual basis for noninfringement of the '471 patent.

"Answer: I'm not in a position to say if we're infringing or not infringing. I believe that you have documents that lay out our stance on that.

"Question: That may or may not be true.  The first part , if that's your answer, that you don't have an opinion, whether you're infringing or not infringing, I accept that.

"Answer: That's my answer.

"Question: For the '825 patent, is the same answer, do you not have an opinion whether - -

"Answer: Correct.

"Question: The next paragraph two, the factual basis for the second affirmative defense in validity were both the '471 patent and '825 patent, according to proof elements for each ground of invalidity pleaded.  And can you tell us the factual basis on Microsoft's behalf for the '471 patent?

"Answer: No.

4/13/06 Trial Tr. 13:4-13:23.

Microsoft contends that the only effect Cole's testimony could have was to create the type of improper negative inference against Microsoft that the Federal Circuit banned in *Knorr-Bremse*.[5] In *Knorr-Bremse*, the Federal Circuit held that a party's failure to receive advice of counsel cannot provide an adverse inference or evidentiary presumption that if the party had obtained such advice it would have been unfavorable.  *Id*. at 1346.  There is a difference between the adverse inference discussed in *Knorr-Bremse* and any inference that might have arisen from the deposition testimony of Cole.  Cole testified that she did not have an opinion related to either infringement or invalidity with regard to the patents-in-suit.  The inference that the jury could have drawn from Cole's

---

[5] The jury sent a note to the Court during deliberations that stated "Susan Cole's deposition."  The Court responded that sections of her deposition were read into the record and that they should recall this evidence as any other testimony, but that no transcript or copy of the deposition was available.  4/18/06 Trial Tr. 288:25-290:3.

14

testimony was that Microsoft did not seek the advice of counsel based on the fact that Cole did not have an opinion on the subjects of infringement or invalidity.   This type of inference is still appropriate under Federal Circuit authority.  In *Knorr-Bremse*, the Federal Circuit specifically stated that it was not addressing the question of whether, "the trier of fact, particularly a jury, can or should be told whether or not counsel was consulted (albeit without any inference as to the nature of the advice received) as part of the totality of the circumstances relevant to the question of willful infringement." 383 F.3d at 1346-47.  Neither the Court nor z4 instructed the jury to draw an adverse inference or evidentiary presumption that had Microsoft obtained the advice of counsel, the opinion would have been unfavorable.  Accordingly, the portion of Cole's testimony read into evidence by z4 was not improper.

Contrary to Microsoft's argument, z4 introduced evidence, other than Cole's deposition, to support willful infringement of the patents-in-suit.  It is undisputed that Microsoft had knowledge of the '471 patent before this suit was filed.  z4 introduced some evidence that Microsoft had knowledge of the '471 patent as early as 2000 and introduced substantial evidence that Microsoft was aware of the patent by February 2003.  z4 presented evidence that in 2003 it approached Microsoft in an attempt to license the '471 patent, provided Microsoft with a copy of its patent portfolio, which included the '471 patent, and provided Microsoft, at Microsoft's request, with a claim chart for the '471 patent outlining literal infringement of the '471 patent based on Microsoft's products.  Microsoft presented no evidence that it investigated the scope of the '471 patent to form a good faith belief that it did not infringe or that the patent was invalid in 2003 or even after this suit was filed.  Accordingly, Microsoft did not prove that it made a reasonable determination that it was not infringing the '471 patent after learning of it.

Microsoft argues that it was acting in good faith because it invented and commercialized product activation in BP 98 before Colvin patented his invention.  However, the jury did not accept the argument that Microsoft anticipated Colvin's '471 patent and, therefore, this argument does not insulate Microsoft from a finding of willful infringement.

Microsoft claims that it did not have knowledge of the '825 patent until z4 filed suit on September 22, 2004 and, therefore, argues that it did not have a duty of care regarding the '825 until that date.  It is undisputed that Microsoft did not have a duty of care with regard to the '825 patent until it actually issued.  However, z4 did introduce evidence that Microsoft was aware of the pending '825 patent as early as 2003, and therefore, received advance warning that it might infringe the patent, when and if it issued.  Although Microsoft may not have had a duty of care to insure it did not infringe the '825 patent until after the patent actually issued, there is evidence that Microsoft knew of the '825 patent before the suit was filed.

Microsoft claims it showed due care after the suit was filed because it promptly hired litigation counsel to defend against z4's claims and had substantial defenses of noninfringement, invalidity, and inequitable conduct.  However, the Federal Circuit has held that "defenses prepared for trial are not equivalent to the competent legal opinions of non-infringement or invalidity which qualify as "due care" before undertaking any potentially infringing activity." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1352 (Fed. Cir. 2001).

Furthermore, as discussed below in more detail, Microsoft's behavior during the litigation of this case was far from exemplary and supports a finding of willfulness.

While Microsoft did present substantial defenses at trial that a reasonable jury could have found convincing, in this case, the jury did not.  Based on the totality of the circumstances, a

16

reasonable jury also could have concluded that Microsoft willfully infringed the '471 and '825 patents, as the jury did here.

Insufficient Damages to Support $115 Million Dollar Award

Microsoft argues that no reasonable jury could have concluded that a $115 million damage award against Microsoft was warranted.  Microsoft contends that the testimony of z4's damages expert Walter Bratic ("Bratic") was legally insufficient and should have been excluded from evidence as contrary to the Court's ruling on a pre-trial motion in limine.  Microsoft claims that the Court made a definitive ruling regarding the admissibility of issues outside of all expert reports by granting Defendants' pre-trial motion in limine.  Microsoft contends that it did not need to object to evidence that violated the motion in limine but points to two instances where it did object to such evidence at trial.[6]

The Court's rulings on the pre-trial motions in limine were not definitive rulings.  As the Court stated during the hearing regarding various motions in limine, "It is just a motion in limine and that doesn't mean that either side can't approach the bench.  And I'm not ruling on admissibility" and "I'm not ruling that it won't be admissible, I'm just grating the motion in limine." 3/23/06 Pretrial Tr. 39:18-20, 61:10-11.  The Court repeatedly clarified during the pre-trial hearing that by granting a motion in limine the Court was not making a definitive ruling on admissibility. At trial, Microsoft was still required to object to what it perceived as a violation of the granted motion in limine.  On this particular issue, the Court could not know what was within each expert's report to determine if certain testimony was outside of the report.  Accordingly, the duty fell on

---

[6]  Microsoft objected twice to evidence it thought was outside the scope of Bratic's report.  One of these objections related to Bratic's mention of other licenses that Colvin had entered into and the other objection was not specific but seemed to be related to Bratic's testimony of a 38% increase in product sales at Microsoft.  *See* 4/13/06 Trial Tr. 46:9-48:2, 64:16-23.  Both objections were overruled.

Defendants to bring such testimony to the Court's attention if they believed it was outside of the expert's report.  A party is not allowed to sit on its hands during trial and then object after trial that an expert's testimony was outside of his expert report and inadmissible.  The Court overruled the objections Defendants made at trial, and Defendants waived all other objections under Rule 103 of the Federal Rules of Evidence.  Accordingly, Bratic's testimony was properly considered by the jury.

Microsoft further argues that z4 did not present sufficient evidence to support the jury's damage award.  After a jury concludes that a patent is infringed, "a patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'"  *Unisplay, S.A.  v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995)(citing 35 U.S.C. § 284 (1988)).  A patentee is entitle to "reasonable royalty" damages when lost profits or an established royalty rate cannot be proven.  *Id*.  "Reasonable royalty" damages are calculated by considering a hypothetical negotiation between the patentee and the infringer at the time that the infringement began.  *See id*.  The analysis involved in determining "reasonable royalty" damages inherently involves approximation and uncertainty, however, some factual basis for the damage calculation must exist and the damage rate must be supported by relevant evidence in the record.  *See id*.  The determination of "reasonable royalty" damages is a question of fact.  *Id.*  When the infringing party files a motion for JMOL on damages awarded by a jury, "'the trial court determines whether the jury's verdict is against the clear or great weight of the evidence.'"  *Id*. (citing *Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360, 1367 (Fed. Cir. 1991)).

Microsoft claims that z4 did not produce quantifiable evidence of damages such as the

18

revenue or license numbers for the accused products and that there was not sufficient evidence of a reasonable royalty aside from highlights by Bratic that Microsoft's revenue grew during the period of the alleged infringement.  Bratic based the growth rate in his damage calculation on Microsoft's reports from Cole that were admitted into evidence.  He explained how he got to his "conservative" estimate of a growth rate based on the documented profits of Microsoft for the accused products during the two possible periods of infringement.  *See* 4/13/06 Trial Tr. 37:14–45:18; Pl.'s Ex. 102. Evidence of an infringer's actual profits are generally admissible when calculating a "reasonable royalty."  *TWM Mfg. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986).

Microsoft also contends that Bratic's royalty calculation was improperly based on a lost profit model.  Microsoft urges that Bratic's royalty calculation was based on z4's business plan that was speculative and assumed the production of an actual product.   Contrary to Microsoft's contentions, Bratic testified with regard to a hypothetical negotiation and based his royalty calculation on hypothetical royalty rates, infringing units sold, revenue from the infringed products, and an explanation of how he reached his damage amount.  *See* 4/13/06 Trial Tr. 30:23-37:13, 45:19-46:2, 48:4-54:6, 54:10-62:21; Pl.'s Ex. 564.  Bratic's calculations were based on documents and evidence that were properly before the jury and that were not objected to by Defendants.  *See* 4/13/06 Trial Tr. 37:14-45:18.  Accordingly, there was a factual basis for the damage calculation presented by z4 at trial and relevant evidence to support the jury's determination of damages.

*Conclusion*

For the reasons discussed above, Microsoft's motion for JMOL is **DENIED**.

**Autodesk's Motion for Judgment as a Matter of Law Regarding Damages**

Autodesk argues that no reasonable jury could have concluded that an award of $18 million

19

dollars in damages against Autodesk was warranted.  Autodesk also contends that the testimony of z4's damages expert Bratic was legally insufficient because it should have been excluded as contrary to the Court's pre-trial ruling on Defendants' motion in limine.  Autodesk, like Microsoft, argues that the Court definitively ruled on the issue by granting Defendants' pre-trial motion in limine.  For the same reasons discussed above with regard to Microsoft's motion for JMOL on damages, the Court rejects Autodesk's argument that Bratic's testimony should not have been considered by the jury.

Autodesk further argues that Bratic's testimony regarding Autodesk's damages is insufficient.  Autodesk contends that Bratic made no attempt to quantify damages and, therefore, the jury could not have relied on any quantified damage evidence because it did not exist.  However, z4 introduced Plaintiff's Exhibit 565, which showed the numbers used to calculate damages against Autodesk.  Bratic testified about the documents he used to gather information about Autodesk's revenues based on accused products, he discussed the factors he considered in calculating the royalty rate, and he indicated how he calculated the damages.  4/13/06 Trial Tr. 29:8-30:22, 30:23-37:13, 45:19-46:2, 48:4-53:10, 54:7-55:21, 57:19-58:11, 71:10-73:7.  Bratic did not go into as much detail when discussing the documents behind the numbers used to create Plaintiff's Exhibit 565 related to Autodesk as he did when discussing the damage calculations for Microsoft.  However, Bratic identified the documents that he referred to and made it clear that he used the same method described with regard to his Microsoft damage calculation.  Autodesk had the opportunity at trial to cross-examine Bratic on the basis of his calculation and the documents used to create Plaintiff's Exhibit 565.

Autodesk also argues that Bratic's reasonable royalty calculation was improperly based on

a lost profits model.  Like Microsoft, Autodesk's argument that Bratic based his damage calculation on a lost profits model is unpersuasive.  As discussed above, Bratic testified that he based his calculations on a hypothetical negotiation.

Autodesk contends that there is no basis for the 1.5% royalty rate used by Bratic to calculate the damages against Autodesk.  "A jury's choice [of a reasonable royalty] simply must be within the range encompassed by the record as a whole."  *Unisplay*, 69 F.3d at 519.  Although the explanation was brief, Bratic did explain how he got to the 1.5% royalty rate.  Furthermore, Colvin explained the royalty rates he had accepted when licensing previous patents.  4/11/06 Trial Tr. 95:3-12; 4/13/06 Trial Tr. 54:7-55:5, 73:4-6.

Finally, Autodesk argues that Bratic's testimony and report did not consider the availability of a noninfringing alternative.  However, Defendants directly confronted Bratic about this issue on cross-examination and he explained that he considered the noninfringing alternatives and concluded that they were not as effective at stopping piracy as the patents-in-suit.  *See* 4/13/06 Trial Tr. 87:1-88:9.

Although z4 provided less evidence related to the damage calculation against Autodesk, than it did against Microsoft, it did present a sufficient factual basis for the damage calculation and that calculation was supported by relevant evidence.  *See* 4/13/06 Trial Tr. 30:23-73:7; Pl.'s Ex. 565.  Accordingly, Autodesk's motion for JMOL on damages is **DENIED**.

## MICROSOFT AND AUTODESK'S MOTION FOR NEW TRIAL

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which new trials have heretofore been granted in actions at law in courts of the United States."  "A new trial may be granted, for example,

if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).

Defendants move for a new trial on multiple grounds. Defendants argue that they are entitled to a new trial because prejudicial error was committed when the court refused to allow testimony on what prior art was and was not before the patent examiner and then refused to instruct the jury on this point. Defendants claim that a fundamental tenet of patent law is that "while the presentation at trial of a reference that was not before the examiner does not change the presumption of validity, the alleged infringer's burden may be more easily carried because of this additional reference." *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000). Defendants also argue that the Court erred by not allowing an instruction stating, "[t]hat the burden is more easily carried when the references on which the assertion is based were not directly considered by the examiner during prosecution." 4/18/06 Trial Tr. 134:1-135:2.

Defendants produce no authority that the failure to give the requested instruction is error. In fact, Defendants' instruction would be improper because it might lead the jury to believe that the burden of proof is less than clear and convincing when prior art was not considered by the PTO. This is in direct contradiction to Federal Circuit law. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050 (Fed. Cir. 1988)(holding that the burden of proof is not reduced when prior art presented to the court was not considered by the PTO).

In support of their argument, Defendants also cite a paragraph from the section entitled "Parts of a Patent" from the Federal Circuit Bar Association's Model Jury Instructions, which indicates that the cover page of a patent lists the prior art publications considered by the PTO. This

is not the instruction Defendants requested at trial and it is not even related to a model instruction on the validity of a patent.  Section 9.2 of the Fifth Judicial Circuit Pattern Jury Instructions (2004) sets out a pattern jury instruction related to patent validity.  This instruction is based on Federal Circuit law and makes no mention of Defendants' requested instruction.  The Court did not commit error by not allowing Defendants' requested instruction.

Defendants also contend that the jury was prohibited from learning that the prior art presented in this case was not before the examiner.  Defendants complain that an objection sustained by the Court prevented them from explaining to the jury what prior art was and was not considered by the patent examiner in prosecuting the patents-in-suit.  The Court did not prevent Defendants from presenting evidence of what prior art references were on the face of the patent and, therefore, considered by the PTO in prosecuting the patents-in-suit.  The Court sustained z4's objection that Defendants' expert could not testify to "art that was before the patent examiner" because the expert "doesn't know what the examiner may have found."  *See* 4/18/06 Trial Tr.at 42:17-25).  This objection was property sustained.   Defendants' expert could not testify to what was before the patent examiner because he did not have personal knowledge of such facts.  Defendants could have rephrased the question to elicit the testimony they claim they were prevented from presenting at trial.  Furthermore, Defendants' expert or some other witness could have testified to what was listed on the patent as prior art and what a certain reference being listed on a patent in that capacity means. The record indicates that Defendants did not make such an attempt.  Defendants should not be granted a new trial based on the Court's  instructions or the Court's sustained objection to the question asked of Defendants' expert.

Defendants further move for a new trial arguing that several jury instructions regarding

corroboration of testimony related to prior art references were improper and prejudicial. The first instruction that Defendants contend was improper states: "Oral testimony from interested witnesses is not sufficient to corroborate reduction to practice. Corroboration must be done using documents." Defendants contend that this instruction prevented the jury from considering the testimony of Aidan Hughes ("Hughes") and other witnesses' testimony on the issue of anticipation.

The Federal Circuit has indicated that there is "a clear requirement" that oral testimony by interested parties related to invalidity must be corroborated by documentary testimony. *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed. Cir. 2003). "[T]he need for corroboration exists regardless of whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation or is uninterested but testifying on behalf of an interested party. That corroboration is required in the former circumstance cannot be debated." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367 (Fed. Cir. 1999).

Hughes is undeniably an interested party to this litigation. He is a current employee of Microsoft, a party to the litigation. Based on Federal Circuit authority and the factual circumstances in this case, the instruction that "Oral testimony from interested witnesses is not sufficient to corroborate reduction to practice," was not improper under the circumstances.

Furthermore, Defendants did not produce any oral testimony other than that of Hughes related to invalidity based on BP 98. Accordingly, the only evidence that could corroborate the testimony of Hughes, an interested witness, was the documentary evidence that Defendants presented on the issue. Therefore, the instruction by the Court that "corroboration must be done using documents" was proper under the circumstances, was not prejudicial to Defendants, and does not warrant a new trial.

24

Defendants also argue that the instruction "An inventor's testimony of conception must be corroborated in a single document" was improper and presents sufficient error to warrant a new trial. The Court agrees that the instruction was improper, however, the instruction does not present harmful error under the circumstances.

The Court's entire instruction in section 6.4.1 titled "Anticipation by Prior Invention - Conception" states:

> Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied and practiced. A conception must encompass all limitations of the claimed invention and is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.
>
> An inventor's testimony of conception must be corroborated in a single document. A document used to corroborate conception need not, itself, be corroborated.

This instruction addresses conception in the context of an anticipation defense. Anticipation by a prior invention under § 102(g)(2) requires that the prior invention was conceived and reduced to practice before the filing date of the patent in question. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). Conception is:

> "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention.
>
> Thus the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue.

*Burroughs Wellcome Co., v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)(citations omitted); *see also Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000).   Corroboration of conception can be done by documentary, physical, or circumstantial evidence. *See Sandt Tech.*, 264 F.3d at 1351.   "Additionally oral testimony of someone other than the alleged inventor may corroborate an inventor's testimony."   *Id*.   Accordingly, under Federal Circuit authority, the instruction that "An inventor's testimony of conception must be corroborated in a single document" is improper.   When an inventor testifies about the conception of his invention, that oral testimony can be corroborated with documents, physical evidence, circumstantial evidence, or oral testimony.[7]

Although the instruction was improper, it does not constitute harmful error under the circumstances.   Defendants admittedly did not name an inventor of BP 98.   In their Motion for JMOL of Invalidity, Defendants stated, "For its § 102(g) defense, Microsoft did not need to name a particular person, whether David Pearce, Philippe Goetschel, or Aidan Hughes.   It was sufficient, under *Dow* that Microsoft corporately both conceived and reduced to practice before Mr. Colvin."   Again in their Motion for New Trial Defendants stated, "Moreover, focusing on an argument that is incorrect as a matter of law, z4 argued that the Defendants had failed to identify who **the** inventor of Brazilian Publisher was and therefore it was not prior art."   Defendants again cite *Dow* in support of their argument.[8]   During closing arguments, Defendants argued: "And they say they're not an

---

[7]  The oral testimony of an interested witness such as Hughes can be used to corroborate the testimony of an inventor on the topic of conception, however, that oral testimony itself may require corroboration as discussed above.

[8]  It is unclear whether Defendants now claim here that they argued at trial that Hughes was in fact the inventor of Brazilian Publisher in contradiction to their statements in their Motion for JMOL on Invalidity that they did not name an inventor.   Defendants point to their closing argument in which Defendant's counsel stated, "And you heard Mr. Hughes, I'll just remind you, he's the man who did this at Microsoft.   And I think it's interesting that we get criticized for not bringing other witnesses in this case.   Because if you listen to Mr. Hughes testify, who at Microsoft, who could possible know more about product activation than the man who did it then and the man who does it now?   Who was it that we should have brought to tell you about this patent case, about this patent case and about product activation than the man who did it?"   4/18/06 Trial Tr. 258:13-22

inventor at Microsoft of what ended up in here.  And with all due respect, how did it get created

then?  You can't have a physical thing like this that Mr. Hughes followed the architecture right here

in these documents which he explained to you preceded Mr. Colvin if they didn't do it."  *Id.* 268:8-

14.  Based on the testimony presented at trial, Defendants' closing arguments, and post-trial briefing,

it is only reasonable to conclude that Defendants' position at trial was that Microsoft, as a company,

conceived the anti-piracy portion of BP 98 that Hughes then reduced to practice, as outlined in the

specifications entered as exhibits by Defendants.

In accordance with Microsoft's position regarding the inventor of BP 98, Defendants never

presented oral testimony of an individual inventor who allegedly conceived the anti-piracy portion

of BP 98.[9]   Although the instruction that "An inventor's testimony of conception must be

corroborated in a single document" is incorrect, it was not at issue in the case because there was no

oral testimony by an inventor regarding the conception of BP 98.  Therefore, whether such testimony

must be corroborated by a "single document" was not an issue in the case.  The jury had to ignore

the instruction because it could not be applied under the facts presented at trial by Defendants.

Based on these facts and without deciding whether or not Defendants can legally argue that

Microsoft, as a company, conceived an invention,[10] the improper instruction could not create

---

[9]  Even if Defendants are now attempting to claim that Hughes was the one they argued conceived the anti-piracy portion of BP 98 at trial, Hughes also never testified to a conception date of his invention that would come near to satisfying the test for conception laid out above.

[10]  Defendants argue that they are not required to name an individual inventor who conceived the prior art invention that allegedly anticipated Colvin's patents.  Defendants do not identify an individual author or inventor or group of authors or inventors for the documents that they claim prove conception of the invention by Microsoft that Hughes then reduced to practice in BP 98.  z4 argues that to succeed on a defense of anticipation under § 102(g) Defendants must identify an individual inventor from Microsoft that actually conceived the invention.

   As discussed above in the text, the Federal Circuit's test for conception with regard to anticipation requires the formation of an idea in the mind of the inventor.  *See Burroughs Wellcome Co.*, 40 F.3d at 1228.  "Conception is 'the formation in the mind of the inventor[ ] of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice.'"  *Singh*, 222 F.3d at 1367.  Microsoft the corporation cannot form ideas in its mind.  In *New Idea Farm Equipment Corp. v. Sperry Corp.*, 916 F.2d 1561, 1566 n.4 (Fed. Cir.

27

sufficient error to warrant a new trial on the issue of anticipation.

Defendants move for a new trial based on a vague argument that the Court's instructions were insufficient to allow the jury to determine particular pieces of prior art. Defendants do not identify what instructions they are complaining about. Defendants' vague and unclear argument on these grounds do not warrant the granting of a new trial.

Defendants further argue that the Court committed prejudicial error by removing Defendants' requested instruction related to the defense of derivation based on R13. Defendants argue that they did not need to object at the charge conference because they submitted a request for the derivation instruction in their joint proposed jury instructions and z4 objected to the instruction in the joint proposed instructions. However, the joint proposed jury instruction referred to by Defendants was not the Courts' proposed charge that Defendants are required to object to at the charge conference. The document Defendants claim z4 objected to was the parties' charge not the Court's. The Court presented its proposed jury charge to the parties, and Defendants did not object to the absence of the derivation instruction. Accordingly, Defendants waived any objection to the absence of the

---

1990), the Federal Circuit stated, "the judge properly recognized that people conceive, not companies, stating that "[w]hen I refer to Hesston, I mean to include Mr. Burkhart and all his colleagues who worked on the machines in question." *See also Froson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)("Corporations don't' invent; people do.")(overturned on other grounds).

Microsoft cites *Dow Chemical Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1339-41 (Fed. Cir. 2001), arguing that it supports its contention that an inventor does not need to be identified as conceiving the invention for anticipation purposes. In *Dow*, the Federal Circuit held that the corporate defendant Astro-Valcour, Inc. ("AVI") "clearly appreciated the existence of its new process and product." 267 F.3d at 1341. The court stated, "We find undisputed, clear and convincing evidence in the record that AVI's employees immediately appreciated what they had made, and indeed its significance, when they made isobutane-blown foam in March and August of 1984." AVI employees testified to the fact that they were aware of the significance of the creation of the invention that was found to invalidate plaintiff's patent. The Federal Circuit's holding in *Dow*, relied on so heavily by Defendants, does not expressly hold that a company can conceive an invention.

Federal Circuit law regarding conception repeatedly discusses the "mind" of the inventor and implies that establishing conception of an invention requires the identification of the individual or group of individuals who did the actual conceiving. Furthermore the case law cited above indicates that the Federal Circuit only recognizes people, and not companies, as inventors. Accordingly, Defendant's contention that they did not need to name an individual inventor responsible for conceiving the invention embodied in BP 98 is unpersuasive.

instruction.  *See* Fed. R. Civ. P. 51.

Defendants argue that the Court's jury instruction related to willfulness gave undue weight to instructions regarding the opinion of counsel and invited the jury to draw an improper adverse inference.  The Court's instruction undisputedly set out the correct standard for willful infringement and then stated that "the absence of a lawyer's opinion does not require you to find willfulness."  The Court is not persuaded that Defendants suffered any prejudice as a result of the Court's instruction regarding willfulness.

Defendants contend that it was prejudicial error for the Court to instruct the jury that "[i]n deciding whether to combine what is described in various items of prior art, you should keep in mind that there must be some motivation or suggestion for a skilled person to make the combination covered by the patent claims."  This instruction was proper under Federal Circuit precedent.  *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323-1324 (Fed. Cir. 1999)("The party seeking patent invalidity based on obviousness must also show some motivation or suggestion to combine prior art teachings.").

Defendants move for a new trial arguing that the Court's construction of the terms "automatically contacting" in the '471 patent and "user" in the '471 and '825 patents were improper.  With regard to "automatically contacting," Defendants re-urge the arguments they presented to the Court at the *Markman* hearing and in their *Markman* briefing.  The Court's ruling on the term "automatically contacting" stands and Defendants are not entitled to a new trial on these grounds.

As to the term "user," Defendants argue that they relied on the Court's ruling at the March 26, 2006 pre-trial conference to mean that their expert could testify to his interpretation of the term "user."  The Court stated during the pre-trial conference that "I'm just going to have to deal with this

when I get into it" and "I'll take objections at the time it comes in" and did not make any statements that Defendants could have reasonably relied on to believe that their expert's interpretation of the term "user" would be allowed if objected to.  The term "user" became disputed during the course of the trial.  "The court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments*, *Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  As discussed above, the Court construed the term "user" after hearing argument from the parties and stands by its ruling.  Accordingly, Defendants are not entitled to a new trial based on these grounds.

Defendants move for a new trial based on comments made by z4 before the jury with regard to Defendants' witness Cole who was not present at trial.  During the pre-trial conference, the Court granted Defendants' Motion in Limine with regard to z4's ability to comment on the absence of Cole.  In granting the motion the Court stated, "I will grant your Motion in Limine.  But if you wish to go into it, feel free to approach the bench and I'll be glad to let you walk down that path if you want."  In granting Defendants' Motion in Limine pre-trial, the Court did not make a definitive ruling on the issue of whether testimony related to Cole's absence was admissible but rather employed a prophylactic measure that required z4 to approach the bench before going into testimony on the subject.

At trial, Defendants' expert Brian Napper mentioned Cole's deposition testimony to support his argument, to which z4 responded that she was not present at trial to support her testimony.  Whether z4 should have approached the bench prior to going into her absence at trial is questionable.  However, under Rule 103 of the Federal Rules of Evidence, Defendants were required to timely object to the mention of Cole's absence if they felt it was in violation of their pre-trial

motion in limine.  Defendants did not object to z4's mention of Cole's absence and, therefore, Defendants did not properly preserve any error that may have occurred.

Defendants move for a new trial on the grounds that the Court improperly excluded Philippe Goetschel's ("Goetschel") June 1995 Memo from evidence.  During trial, z4 read one of Microsoft's responses to an interrogatory into evidence.  4/13/06 Trial Tr. 119:9-120:20.  That response referenced Goetschel's June 1995 Memo, however, z4's reading of the interrogatory response into evidence did not also automatically enter the Goetschel Memo into evidence.  Any argument that it did is absurd.

Defendants further argue that z4 agreed to allow the Goetschel Memo into evidence when four days later Defendants attempted to enter multiple documents into evidence by referring to the documents' bates numbers and stating that they were mentioned in an interrogatory response read into the record by z4.  z4's counsel stated in objection to Defendants' attempt to enter these documents, "on the representation that they are the documents from the interrogatories, we have no objection.  We'll check that.  And if there's a problem, we'll raise it later."  Later that same day when Microsoft attempted to question Hughes on the Goetschel Memo, z4 objected on the grounds that Hughes was not the custodian and had no personal knowledge as to certain aspects of the memo. The Court clarified at the time of z4's specific objection to the Goetschel Memo that z4 had reserved the right to object to these documents, "I think he reserved the right to object to those after he had a chance to review them."  4/17/06 Trial Tr. 36:11-37:10.

Under the circumstances, z4 maintained the right to object to the Goetschel Memo and timely raised that objection when Microsoft attempted to use the memo at trial.

Defendants further complain that the Court improperly excluded the Goetschel Memo on the

basis of hearsay.  Defendants contend that Hughes could provide the proper predicate to establish the memo as a business record.  The Court did not allow Hughes to testify to the requirements of Rule 803(6) of the Federal Rules of Evidence to prove that the document was a business record because the actual author of the memo, Goetschel, was sworn as a witness in the case and could have testified himself as to the authenticity of the document.  Furthermore, the Court did not find that Hughes was a qualified witness to testify to all of Rule 803(6)'s requirements as to the Goetschel Memo and properly excluded the document under the circumstances.

Defendants move for a new trial arguing that the Court's exclusion of testimony from Hughes regarding a database of detailed customer registration information for BP 98 from 1998-99 and a summary chart created by Hughes from the data in the database was improper.  The circumstances surrounding the exclusion of this evidence is discussed in more detail below.  However, the Court properly excluded Hughes's testimony on the database and summary chart.  Accordingly, a new trial is not warranted on these grounds.

Defendants move for a new trial on the grounds that they were prejudiced when the Court allowed z4 to read excerpts from the deposition of Microsoft's Rule 30(b)(6) representative, Cole, into evidence.  The excerpts read into evidence from Cole's deposition related to her knowledge of Microsoft's defenses on noninfringement and invalidity.  Neither Cole nor any other corporate representative from Microsoft was present at trial on behalf of Microsoft.[11]  Defendants objected based on Rules 402 and 403 of the Federal Rules of Evidence arguing that, because Cole was not an attorney, z4 could not ask questions about legal conclusions.  The Court allowed the testimony because Cole explained in her deposition why she could not answer the questions and because there

---

[11]  Microsoft decided not to bring Allen Nieman as a corporate representative at trial in place of Susan Cole.

was nothing legally inadmissible about the questions and answers considering that she was Microsoft's corporate representative. *See* 4/13/06 Trial Tr. 5:4-8:7. The Court's ruling was proper under the circumstances and does not establish grounds for a new trial.

Defendants move for a new trial on the grounds that z4 improperly commented on the number of exhibits Defendants brought to trial. Defendants included over 3,000 exhibits, totaling 30 linear feet of documents, on their pre-trial exhibit list. As discussed below in more detail, Defendants' attempt to flood z4 in exhibits constituted litigation misconduct. Any mention by z4 about Defendants' excessive exhibits does not establish grounds for a new trial.

Defendants move for a new trial arguing that z4 made improper arguments regarding Microsoft's revenues, size, and alleged actions toward z4 during z4's closing argument. Defendants also contend that z4 improperly commented on the absence of Microsoft witnesses in violation of this Court's order. Regardless of whether these comments present sufficient prejudice, if any, to justify a new trial, Defendants did not object at trial to any of the comments they now complain of. Accordingly, under Rule 103 of the Federal Rules of Evidence, Defendants waived their right to complain on these grounds and a new trial is not warranted.

Defendants move for a new trial on the grounds that the jury was improperly instructed that it could make an adverse inference against Microsoft with regard to Plaintiff's Exhibit 558, which was an email sent from Luiz Moncau ("Moncau"), a Microsoft employee, to David Pearce ("Pearce"), Cole and several other Microsoft employees ("the Moncau email").[12]   As discussed in more detail below, the Moncau email was not produced to z4 until the day before trial when z4 took the deposition of Moncau and he produced the email. Although z4 had requested all relevant

---

[12]   The Moncau email is relevant to whether BP 98 worked for its intended purpose.

documents of Moncau, Cole, and Pearce, during discovery, which should have included this email, the email was not produced until Moncau's deposition the day before trial.  The Court properly instructed the jury with regard to the Moncau email as a sanction against Microsoft for not producing the email, which should have been produced much earlier.  Accordingly, the instruction does not establish grounds for a new trial.

Finally, Defendants move for a new trial on the grounds that the great weight of the evidence is against the verdict on the issues of infringement and invalidity of the patents-in-suit.  Defendants base their argument on the same grounds they presented in support of their motions for JMOL on infringement and invalidity.  For the same reasons discussed in regard to Defendants' motions for JMOL, Defendants have not established that a motion for new trial is warranted on these grounds.

For the reasons discussed above, Defendants' Motion for New Trial is **DENIED**.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON INEQUITABLE CONDUCT

The Court reserved the issue of Colvin's inequitable conduct in obtaining the patents-in-suit for itself and heard evidence related to this issue outside the presence of the jury.  After considering the testimony, exhibits, arguments of counsel, and supporting memoranda, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure with regard to inequitable conduct.[13]

**Background**

Colvin purchased a copy of Autodesk's R13 software in August of 1995 and registered his copy of the software with Autodesk on September 1, 1995.  R13 came on two separate disks, a CD-

---

[13]  To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

ROM disk and a floppy disk referred to as the "Personalization Disk."  To install R13, a user would insert the CR-ROM into the user's CD drive.  The CD would then begin the software installation process.  During the installation process the user would be prompted to insert the floppy disk into the floppy disk drive.  Once the floppy disk was inserted, the user was asked to enter various personal information.  The user was not prompted to enter the serial number of the product or any other authorization code at this point.  After the user's personal information was entered, the installation process continued.  Once the installation process was completed, the user configured the software by answering different questions related to the user's computer and other hardware.

After the configuration of the software was completed, the program asked the user if he wanted "to enter authorization at this time?"  The user could answer either "Y" for yes or "N" for no to this question.  If the user chose "Y," he was prompted to enter an authorization code given to him by the dealer who sold him the software.  If the user chose "N," he did not have to enter the authorization code at that time and was informed of a thirty day grace period before he would have to enter an authorization code to allow the use of the software.  Users could also get an authorization code from Autodesk by contacting Autodesk via telephone, fax , or postal mail.

When Colvin installed his version of R13 he was asked to enter personal information but was never prompted to enter a serial number.  When asked if he wanted to authorize his software he chose "Y" and entered the authorization code given to him by the dealer who sold him the program.  Colvin was never informed of a 30 day grace period because he chose "Y" instead of "N."  Colvin never owned a copy of Autodesk's R14 software.

The prosecuting attorney for the '471 patent was David Bir ("Bir").  Colvin did not provide Bir with any information about R13 or R14 during the prosecution of the '471 patent.  The

35

prosecuting attorney for the '825 patent was James Kallis ("Kallis").  As with the '471 patent, Colvin did not provide Kallis with any information regarding R13 or R14 during the prosecution of the '825 patent.

U.S. Patent No. 5,341,429 ("the '429 patent") is listed under "References Cited" on the '471 patent, indicating that it was considered by the PTO during the prosecution of the '471 patent.  The '429 patent discloses an anti-piracy process that is very similar to the process utilized by R13.  One embodiment of the '429 patent allows the software to be used during a grace period for a certain number of times before it is enabled.  An ID number is embedded in the software to allow the software to run during the grace period.  Once the grace period is over, a password is manually provided to the user.  The user then communicates the password to the program to activate the software.

**Applicable Law**

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive."  *Molins PLC v. Textron Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

> One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO.

*Id.*  The party asserting inequitable conduct through a withholding of information must separately establish materiality and intent, as they are separate components of inequitable conduct.  *See id.* "Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred."  *Id.*  The party asserting inequitable conduct must prove by clear and convincing evidence that the applicant

36

"made a deliberate decision to withhold a known material reference," and not merely the omission

of an act that should have been performed.  *Id*. at 1181.

> Information is considered material if:
>
> [I]t is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> > (I) Opposing an argument of unpatentability relied on by the Office, or
> > (ii) Asserting an argument of patentability.

*Purdue Pharma, L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1129 (Fed. Cir. 2006)(citing 37 C.F.R.

§ 1.56(b) (2004)).

**Analysis**

Defendants contend that the '471 and '825 patents are unenforceable based on the inequitable

conduct of Colvin.  Defendants argue that Colvin intentionally withheld a material reference, R13,

from the Patent and Trademark Office ("the PTO") during the prosecution of both patents.

Defendants argue that R13 is material because it is inconsistent with a position taken by Bir when

he remarked in the '471 file history that:

> Applicant has amended a number of claims to further distinguish over the prior art relied upon by the examiner.  The prior art relied upon taken alone or in any permissible combination does not disclose a number of features found in various claims as filed, and other claims as amended, including requiring a first password or authorization code to activate software and requiring additional passwords or authorization codes after expiration of an interval associated with the password.

4/12/06 Trial Tr. 70:8-17.  Defendants contend that R13, like the '471 patent, required two

passwords, making Bir's statement inconsistent and, therefore, making R13 material.

R13 does not require two passwords.  R13 only requires one password in the form of an

authorization code that is communicated to the software to permanently enable the software. Defendants contend that the serial number embedded in the floppy disk of R13 is a password. However, Defendants did not prove by clear and convincing evidence that the serial number embedded in the floppy disk had anything to do with activating the software.  Furthermore, the fact that the serial number is embedded in the software does not make it a password in the sense that the concept password is used in the '471 patent.

Defendants argue that the '471 patent specifically allows for a password to be a serial number.  This is true; the '471 patent indicates that a serial number can act as a password.  However, there is nothing in the '471 patent that indicates that a serial number embedded in the software as it is in R13 and the '429 patent is a password.  If a serial number is used as a password in the invention disclosed in the '471 patent,  the serial number must be communicated to the software and cannot be a part of the software.  Bir's statement that the '471 is distinguishable from the prior art based on its multiple passwords is not inconsistent with R13.  Accordingly, R13 is not material on this basis.

Furthermore, R13 is cumulative of the '429 patent, which was considered by the examiner during the prosecution of the '471 patent.  The '429 patent and R13 disclose very similar processes for anti-piracy protection.   One embodiment of the '429 patent has a serial number or code embedded in the software and has a grace period that begins without the user having to communicate a password to the software.  Like R13, after the grace period ends, the user must manually obtain a password to activate the software.  R13 is not material to the '471 patent because it is cumulative of the '429 patent, which was considered by the PTO in prosecuting the '471 patent.

**Conclusion**

Defendants did not prove by clear and convincing evidence that R13 was material to the patentability of the '471 patent.  Accordingly, the Court **HOLDS** that neither the '471 or '825 patents are unenforceable due to inequitable conduct.

### z4's MOTION FOR A FINDING OF LITIGATION MISCONDUCT, ENHANCED DAMAGES, AND ATTORNEYS FEES AND EXPENSES

z4 asks the Court to award attorneys' fees and expenses to z4 against both Microsoft and Autodesk and to enhance the damage award against Microsoft for infringement of the '471 and '825 patents.

**Attorneys' Fees**

Under 35 U.S.C. § 285 of the Patent Act, "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  A case may be exceptional based solely on litigation misconduct and unprofessional behavior.  *Rambus, Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).  A case may be deemed exceptional on a party's or its counsel's display of bad-faith during either the pre-trial or trial stages.  *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986)(overruled on other grounds).  The prevailing party seeking an attorneys' fee award has the burden of establishing that the case is exceptional by clear and convincing evidence.  *Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed. Cir. 1985)(overruled on other grounds).  A finding of willful infringement is a factor to be considered in determining if a case is exceptional.  *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987).

In its motion, z4 presents many instances where Defendants acted in bad faith and committed

litigation misconduct sufficient to make this an exceptional case.  The Court discusses the more flagrant here.  First, the Moncau email.

At the last pre-trial conference, the Court deviated from its usual  rules to allow Defendants to bring a belatedly identified trial witness, Moncau, with the condition that z4 could depose Moncau before trial started.  As discussed above, z4 was finally able to depose Moncau on Sunday, April 9, 2006, the very day before trial began.  During the course of Moncau's deposition he revealed an email that was later introduced into evidence as Plaintiff's Exhibit 558 ("the Moncau email").  The Moncau email was an email sent from Moncau to various Microsoft employees including Cole and Pearce and addressed in part whether Microsoft's BP 98 software worked for its intended purpose of stopping piracy.  This was an important piece of evidence for z4 and was unfavorable to Microsoft, yet it had never been produced by Microsoft.  Moncau testified in his deposition that he provided all of his documents to Microsoft's counsel over a year before the deposition.  Nevertheless, the email had never been produced by Microsoft during discovery despite the fact that it was between three Microsoft employees referenced in the email, all of whom allegedly gave all of their relevant documents to Microsoft's counsel for production.  Making matters even worse, Defendants admit they were aware of the Moncau email several hours before Moncau's deposition, but still withheld it from z4 until z4 found out about it during questioning during the deposition.  This raises a serious question as to whether the email would have ever seen the light of day, had z4 not uncovered it during Moncau's deposition the day before trial.  As a sanction for not disclosing the email, the Court instructed the jury that Microsoft failed to produce this document during discovery as it was supposed to have done.

Second, is the Hughes database.  As discussed above, Microsoft attempted to use a summary

chart at trial created by Hughes to demonstrate that BP 98 worked for its intended purpose.  The summary chart had never been produced to z4 and was allegedly only created by Hughes during the first day of trial, April 10, 2006.  The summary chart was allegedly compiled from data found in a Hughes database that tracked the customer registrations of BP 98.  However, the identity and location of this database was never identified to z4 until it appeared as an attachment to a motion for summary judgment long after discovery had closed.  z4 had inquired about this database some eight months earlier during Hughes's deposition in August, 2005.  Hughes testified that the alleged database did not exist.  However, a week later, Microsoft produced a CD labeled "source code" with 11,274 files on it that belonged to Hughes.  At trial Microsoft argued that the database was on the CD in a subfolder and z4 could have found it.  Yet Microsoft admits that it knew all along the database was on the CD and never informed z4 or corrected Hughes's testimony on the topic.

The database became a larger issue when Microsoft attempted to have Hughes testify at trial about data he extracted from the database using his own extraction method.  In an attempt to bolster Defendants' claim that BP 98 worked for its intended purpose,  Hughes intended to testify, based on this data and his own extraction method, that no copy of BP 98 was installed on more than three computers over the internet.  After reviewing the database, z4 discovered at least one instance where the same copy of BP 98 appeared to have been installed on 828 different computers over the internet.  Microsoft's attempt at explaining away this data entry was unpersuasive.

Closer inspection of the database by z4 revealed not only that Hughes's data summary was an inaccurate reflection of the data, but that Microsoft had not accurately disclosed the method of extraction used by Hughes to create his summary chart.  The Court determined that Microsoft had attempted to mislead z4, the Court, and the jury and excluded Hughes from testifying with regard

41

to the database and his summary chart.

Third, is the "Read This First" card. Before trial, Defendants filed a motion for summary judgment on inequitable conduct. Attached to that motion was the declaration of Michelle Winkenbach ("Winkenbach"), which, among other things, was intended to prove that Colvin had received a copy of a blue "Read This First" card when he purchased his personal copy of Autodesk's R-13 software in 1995. Winkenbach's declaration asserted that the SKU number on Colvin's copy of R-13 matched a SKU in Autodesk's bill of materials database, unproduced to z4 at that time, implying that Colvin had received a "Read This First" card with his copy of R-13.

After production of the bill of materials database, z4 discovered that the SKU relied on by Winkenbach was not the same as the one on Colvin's disk and that the information in the database related to the SKU on Colvin's software did not show that a "Read This First" card was included with his software. Defendants claim that the discrepancy in Winkenbach's declaration was merely a mistake. The facts surrounding the Winkenbach declaration are highly questionable. If the information in the Winkenbach declaration was merely a mistake, it could have turned into a very beneficial mistake for Defendants if z4 had not caught the discrepancy in the SKU numbers. In light of the other instances of litigation misconduct by Defendants brought to the Court's attention, Defendants are no longer given the benefit of the doubt before this Court. Accordingly, the Court considers this "mistake" an intentional attempt by Defendants to mislead z4 and this Court.

Fourth, is Defendants' voluminous exhibit tactic. Defendants marked an unprecedented 3,449 exhibits for trial, which resulted in a 283 page exhibit list and took up, as z4 points out, "30 lineal feet." Yet, at trial Defendants only admitted 107 of these exhibits. Defendants argue that the unreasonable number of remaining exhibits were intended to combat z4's previous position that

42

Colvin conceived the invention disclosed in the '471 patent in March of 1996 instead of September 1997.  This excuse is neither reasonable nor believable.  The Court concludes that Defendants attempted to bury the relevant 107 exhibits admitted at trial in its voluminous 3,449 marked exhibits in the hope that they could conceal their trial evidence in a massive pile of decoys.  This type of trial tactic is not only unfair to z4, but creates unnecessary work on the Court staff and is confusing and potentially misleading to the jury.

Finally, the Court is greatly disturbed by the repeated instances where Defendants actions go beyond what can be dismissed as a mere appearance of impropriety and collectively appear to represent a pattern which is of disappointment to the Court and a disservice to legitimate advocacy. The repeated examples, some of which are not even mentioned here, of what can be described as nothing less than misleading on the part of Defendants, justify a conclusion that Defendants committed litigation misconduct.  This conduct, coupled with the fact that Microsoft was found to have willfully infringed the patents-in-suit results in this case being deemed exceptional. Accordingly, the Court awards z4 reasonable attorneys' fees and expenses, excluding expenses related to expert witnesses.

When determining a reasonable attorneys' fee award, a court should consider all relevant circumstances in a case.  *Junker v. Eddings*, 396 F.3d 1359, 1365 (Fed. Cir. 2005).  In determining such an award, a court usually analyzes "hourly time records, full expense statements, documentation of attorney hourly billing rates in the community for the particular type of work involved, the attorney's particular skills and experience, and detailed billing records or client's actual bills showing tasks performed in connection with the litigation."  *Id*. at 1366.

z4 presented the Court with detailed billing records, a detailed explanation of the skill level

43

and experience of each attorney and paralegal billed, and detailed records of its expenses incurred. *See* Supplement to z4 Technologies Inc.'s Motion for an Order Finding Litigation Misconduct, Enhancing Damages, and Awarding Attorney Fees and Expenses (Docket No. 392).  Based on the information provided by z4, the total combined fees and expenses incurred by z4 for this case amount to $2,702,929.  Defendants point to a collection of billing entries that appear to be improper based on the description accompanying the entry.  These entries amount to a total of $20,738, bringing the total fees and expenses for z4 to $2,682,191.

z4 provided the Court with an excerpt from the 2005 American Intellectual Property Law Association's Economic Survey, which indicates that the average cost of litigating a patent case in Texas is $4,993,750.  *Id.*  z4's fees and expenses associated with this case are reasonable considering the complexity of the case and the results z4's attorneys achieved at trial.  Based on all of the relevant circumstances in the case, the Court awards $2,300,000 in attorneys' fees and expenses to be paid to z4, $1,978,000 by Microsoft and $322,000 by Autodesk.[14]

**Enhanced Damages**

A court may in its discretion enhance damages up to three times when there is a finding of willful infringement or bad-faith on the part of an infringing party.  35 U.S.C. § 284; *see SRI Int'l, Inc. v. Advanced Techs. Labs., Inc.*, 127 F.3d 1462, 1468-69 (Fed. Cir. 1997).  "Bad faith" in this context refers to an infringer's lack of due care with regard to avoiding infringement and is more properly called "bad faith infringement." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996).  Although "bad faith" acts such as litigation misconduct are not sufficient alone to support an

---

[14]  Of the total $133,000,000 in actual damages awarded by the jury, Microsoft is responsible for 86% ($115,000,000) and Autodesk is responsible for 14% ($18,000,000). The amount of attorneys' fees and expenses owed by each Defendant is based on the percentage of the total actual damages each Defendant is responsible for.

enhancement of damages, assuming the requisite culpability is present, such acts can be considered in determining whether to award enhanced damages and how much to award.  *See id.* at 1570-71. A finding of willful infringement provides sufficient culpability to justify the enhancement of damages under § 284.  *See id.* at 1571, 1573.

Enhanced damages are a punitive measure taken by the Court to penalize a willful infringer for his or her increased culpability.  *See id*. at 1570.  However, a court can refrain from awarding enhanced damages in light of a finding of willfulness based on the weight of the evidence supporting willfulness and the closeness of the issues at trial.  *See Brooktree Corp. v. Advanced Micro-Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997).  "The paramount determination in deciding enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."  *Read Corp.*, 970 F.2d at 826.  Factors courts consider in deciding whether to enhance damages and the amount of enhancement include:

(1)     whether the infringer deliberately copied the ideas or design of another;
(2)     whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
(3)     the infringer's behavior as a party to the litigation;
(4)     defendant's size and financial condition;
(5)     closeness of the case;
(6)     duration of defendant's misconduct;
(7)     remedial action by the defendant;
(8)     defendant's motivation for harm;
(9)     whether defendant attempted to conceal its misconduct.

*Id*. at 827.

The jury found that Microsoft wilfully infringed both the '471 and the '825 patents.  While it is undisputed that Microsoft did not copy z4's inventions under factor one and that the questions

45

of willfulness, invalidity, and infringement were such that a reasonable jury arguably could have found either way on these issues under factor five, these are the only two factors that  weigh against enhancement of damages.  All of the other factors support the enhancement of damages.

As discussed above, Microsoft did not present any evidence that displayed an attempt to form a good faith belief that it did not infringe the patents-in-suit or that the patents were invalid, prior to the suit being filed.  Even after the suit was filed, Microsoft only points to the fact that it promptly contacted litigation counsel and the defenses put forth by its litigation counsel as evidence of its due care.  However, as stated above, defenses of litigation counsel are not strong evidence of due care.

As discussed above, Microsoft's behavior as a party to this case constitutes litigation misconduct making this an exceptional case.   Microsoft is unquestionably large enough and profitable enough to pay enhanced damages.

Microsoft infringed the '471 patent with knowledge of that patent since at least February 2003.  This time period is significant considering the amount of infringing products that Microsoft sold in that amount of time.  Although there is some evidence that Microsoft could have designed around the patents-in-suit, the Court is not aware of any remedial actions taken by Microsoft in an attempt to design around the patents or to remedy the potential infringement of Colvin's patents.

While the Court is not aware of any direct motivation on the part of Microsoft to harm Colvin, there is ample circumstantial evidence that to Microsoft Colvin and his patent rights were insignificant because Microsoft never thought Colvin would be able to pursue his rights against it. The evidence presented at trial suggests that Microsoft considered z4 a small and irrelevant company that was not worthy of Microsoft's time and attention, even if Microsoft was potentially infringing its patents.  Microsoft might well have taken z4 seriously had z4 been a large and more established

46

company.

Finally, Microsoft attempted to conceal its misconduct as evidenced by the incidents discussed above with regard to litigation misconduct.  Considering the totality of the circumstances, particularly the lack of evidence that Microsoft presented with regard to due care in avoiding infringement of the '471 patent prior to this suit being filed and Microsoft's misconduct during the course of the trial, enhancement of the damages awarded against Microsoft is appropriate.  While the Court could enhance damages against Microsoft up to three times the jury verdict of $115,000,000, or $345,000,000, under the totality of the circumstances, enhancing damages to the maximum extent allowed under § 284 is not warranted.  Accordingly, the Court awards an additional $25,000,000 making a total of $140,000,000 plus attorneys fees to be paid by Microsoft to z4.

## z4's MOTION FOR PREJUDGMENT INTEREST

Section 284 of the Patent Act indicates that a court should award interest in patent cases after a finding of infringement.  35 U.S.C. § 284.  The purpose of prejudgment interest is to place the patentee in as good a position as he would have been had the infringer paid a reasonable royalty instead of infringing.  *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991).  Prejudgment interest should be awarded unless there is a significant justification for withholding such an award, such as a delay in brining suit against the infringer.  *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Bio-Rad Labs. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).  The interest rate used to calculate prejudgment interest and the method and frequency of compounding is left to the discretion of the district court.  *See Uniroyal, Inc.*, 939 F.2d at 1545; *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.,* Inc., 862 F.2d 1564. 1579-80 (Fed. Cir. 1988)(citing *Bio-Rad Labs.*, 807 F.2d at 969).  Prejudgment interest can only be

47

applied to actual damages and not punitive or enhanced damages. *Beatrice Foods*, 923 F.2d at 1580. Interest should be awarded from the date of infringement to the date of final judgment. *Nickson Indus., Inc. v. Rol Mfg*, 847 F.2d 795, 800 (Fed. Cir. 1988).

There is evidence in the record that z4 took measures to avoid litigation with Microsoft prior to filing suit. However, the record does not indicate that z4 unreasonably delayed in prosecuting this action against either Microsoft or Autodesk such that prejudgment interest should be withheld. Accordingly, prejudgment interest shall be awarded to z4 on the actual damages found against both Defendants at the prime rate as of August 18, 2006 compounded monthly through July 31, 2006 and compounded daily for the month of August, 2006. Interest should be calculated from the date of infringement through the date of final judgment.

## OTHER MOTIONS

### z4's Emergency Motion to Strike Docket Entry 344

The parties resolved the issues related to this motion. Accordingly, z4's Emergency Motion to Strike Docket Entry 344 is **DENIED** as moot.

### Autodesk and Microsoft's Emergency Opposed Motion for the Court to Consider the Expert Report of Walter Bratic Relating to Docket Nos. 321 and 323

Defendants ask the Court to consider Bratic's expert report in determining their various motions for JMOL. The Court considered Bratic's expert report to the extent it deemed necessary in ruling on Defendants' motions for JMOL. Accordingly, Defendants' motion is **DENIED** as moot.

### z4's Motion and Memorandum in Support to Unseal Findings Related to z4's Motion for Permanent Injunction for Docket Entries 346, 347, 353, 370, and 371

On June 14, 2006, the Court issued a Memorandum Opinion and Order regarding z4's Motion for Permanent Injunction. The Court resolved the underlying issue related to z4's motion

48

to unseal findings.  Accordingly, the Court **DENIES** z4's motion as moot.

**CONCLUSION**

For the reasons discussed above:

The Court **DENIES** Autodesk's Motion for Judgment as a Matter of Law of Noninfringement; Microsoft's Motion for Judgment as a Matter of Law of Noninfringement; Defendants' Motion for Judgment as a Matter of Law of Invalidity; Microsoft's Motion for Judgment as a Matter of Law Regarding Damages, Non-Retail Products, and Willfulness; Autodesk's Motion for Judgment as a Matter of Law Regarding Damages; and Microsoft's and Autodesk's Motion for a New Trial;

The Court **HOLDS** that the '471 and '825 patents are not unenforceable due to inequitable conduct.

The Court **GRANTS** z4's Motion and Brief in Support for an Order Finding Litigation Misconduct, Enhancing Damages, and Awarding Attorney Fees and Expenses; and z4'sMotion and Brief in Support for Prejudgment Interest.  Accordingly, the Court **ORDERS** Microsoft to pay $1,978,000 in attorneys' fees and expenses to z4, as well as $25,000,000 in enhanced damages and $115,000,000 in actual damages, and **ORDERS** Autodesk to pay $322,000 in attorneys' fees and expenses to z4, as well as $18,000,000 in actual damages.  Additionally, the Court **ORDERS** Autodesk and Microsoft to pay prejudgment interest on the actual damages found against each Defendant at the prime rate as of August 18, 2006 compounded monthly and calculated from the date of infringement for the accused products through the date final judgment is entered in this case.

The Court **DENIES AS MOOT** z4's Emergency Motion to Strike Docket Entry 344; Autodesk and Microsoft's Emergency Opposed Motion for the Court to Consider the Expert Report

49

of Walter Bratic Relating to Docket Nos. 321 and 323; and z4's Motion and Memorandum in Support to Unseal Findings Related to z4's Motion for Permanent Injunction for Docket Entries 346, 347, 353, 370, and 371.

**So ORDERED and SIGNED this 18th day of August, 2006.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**